**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jason Mathis,<br><br>　　　　　　　Plaintiff,<br><br>v.<br><br>CoreCivic, et al.,<br><br>　　　　　　　Defendants. | No. CV-23-00323-PHX-KML (MTM)<br><br>**ORDER** |

　　　　Plaintiff Jason Mathis is currently confined in the Red Rock Correctional Center in Eloy, Arizona (RRCC). Mathis believes defendant Awaal, a nurse practitioner, violated the Eighth Amendment and committed negligence by providing inadequate treatment for Mathis's Hepatitis C (HCV) infection. Mathis also believes defendant CoreCivic had an unconstitutional policy, custom, or practice of denying HCV treatment because of its cost. Awaal and CoreCivic seek summary judgment by arguing the court should ignore Mathis's evidence. The court cannot do so and the motion for summary judgment is denied.

**I.　　Background**

　　　　At all relevant times, CoreCivic was the operator and provider of healthcare to prisoners at RRCC and Awaal was a nurse practitioner employed by CoreCivic. According to CoreCivic, it opts to follow the Arizona Department of Corrections, Rehabilitation and Reentry (ADCRR) "policy and protocols for the treatment of Hepatitis C, as set forth in the ADCRR Medical Services Technical Manual." (Doc. 27 at 1-2.) ADCRR's written policy provides prisoners diagnosed with HCV "will be evaluated for possible treatment" and "[a]ntiviral treatment for HCV is indicated for all patients with HCV unless they have

a life expectancy of less than 12 months due to another disease, or short sentence that precludes completion of treatment prior to release." (Doc. 27-2 at 95.) Thus, the ADCRR policy is that antiviral treatment is "indicated" for all prisoners with HCV but that does not mean every prisoner receives antiviral treatment immediately on diagnosis. Instead, the policy specifies treatment occurs "based on Priorities for Treatment criteria." (27-2 at 95.)

The "Priorities for Treatment criteria" classifies each prisoner based on that prisoner's Aspartate Aminotransferase Platelet Ratio Index score (APRI score)[1] and the prisoner's "fibrosis score" or stage.[2] Prisoners with APRI scores 2.0 and higher or "Stage III and above" were deemed high priority; prisoners with APRI scores between 0.7 and 1.9 or Stage II were deemed intermediate priority; and prisoners with APRI scores less than 0.7 or "Stage 0–Stage 1" were deemed low priority. (Doc. 27-2 at 96.) The policy did not indicate when individuals at each level of priority would obtain treatment.

The parties agree Mathis was diagnosed with HCV before arriving at RRCC in May 2020. The parties also agree that Mathis was seen by medical personnel on particular dates.[3] But the parties present starkly different views of what happened during those encounters. The court must credit Mathis's evidence and draw all inferences in his favor as the non-movant, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), but both parties' views of the encounters are described below to demonstrate the material factual dispute.

---

[1] *See Carley v. Aranas*, 103 F.4th 653, 656 (9th Cir. 2024) ("A patient's APRI score, along with clinical symptoms, are reliable indicator[s] of liver fibrosis, although not definitive.").

[2] A "fibrosis score" is meant to reflect "the severity of liver scarring." *Furman v. Warden*, 827 F. App'x 927, 930 n.4 (11th Cir. 2020). Under this approach "a person can be classified as F0 (no fibrosis), F1 (mild fibrosis), F2 (moderate fibrosis), F3 (severe fibrosis), or F4 (cirrhosis)." *Id.*

[3] Defendants have provided Mathis's medical records but do not state the records are complete. The records do not appear to be in any particular order and contain numerous irrelevant entries. Defendants have made no specific reference to any of the records. Rather, they cite only to a trio of declarations, one of which contains Mathis's medical records as an exhibit. Defendants' motion violates the requirement of Fed. R. Civ. P. 56(c)(1)(A) to cite "particular parts of materials in the record." The court declines to comb through the materials to find medical records supporting declaratory statements. *See Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001); *see also Indep. Towers of Wash. v. Wash.*, 350 F.3d 925, 929 (9th Cir. 2003) ("[j]udges are not like pigs, hunting for truffles buried in briefs") (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)).

On June 16, 2020, Mathis was seen by non-party Physician's Assistant (PA) Montgomery for an "Initial or Follow-up Visit." (Doc. 27-2 at 43.) The medical records indicate the "clinic visit [was] for following conditions: HCV." (Doc. 27-2 at 43.) The medical records also reflect PA Montgomery described Mathis as a "32 [year old] male with HCV approximately 2 years ago," and noted that Mathis's "[l]abs [were] pending." (Doc. 27-2 at 43-46.) During this encounter PA Montgomery informed Mathis he "needed the Hepatitis C treatment" but "CoreCivic policy would not approve the treatment . . . because of how expensive it is." (Doc. 30-1 at 6.)

On December 8, 2020, NP Awaal saw Mathis for another "Initial or Follow-up Visit." (Doc. 27-2 at 58.) The records for this encounter again indicate the "clinic visit [was] for following conditions: HCV." (Doc. 27-2 at 58.) Awaal documented that Mathis's tattoos were a "lifestyle risk factor," and diagnosed Mathis's HCV as "stable" with "fair" control. (Doc. 27-2 at 58-59.) Mathis complained "of profuse sweating, right upper abdomen pain, lethargy, difficulty sleeping, fatigue, weakness, headaches, shaking, and dizziness." (Doc. 30-1 at 7.) Awaal stated those symptoms "were probably side effects of Hepatitis C." Awaal informed Mathis he "needed the treatment, but she would not put in for it." (Doc. 30-1 at 7.) Awaal refused to request HCV treatment for Mathis because "CoreCivic policy would not approve it unless [Mathis] were dying due to how expensive the treatment was." Awaal told Mathis "not to bother putting in any [Health Needs Requests] regarding [HCV] or symptoms because there was nothing she could, nor would, do." (Doc. 30-1 at 7.) Mathis says he complained of symptoms, but Awaal recorded Mathis "[d]enie[d] any viral symptoms." (Doc. 27-2 at 58.)

On June 1, 2021, Awaal saw Mathis again and he again complained "of profuse sweating, right upper abdomen pain, lethargy, difficulty sleeping, fatigue, weakness, headaches, shaking, and dizziness." (Doc. 30-1 at 8.) Awaal stated the symptoms "were probably still side effects" of HCV. Awaal again informed Mathis that he "needed the treatment, but she would not put in for [Mathis] to get it." Awaal believed it would be futile to do so because "it would never get approved unless [Mathis] was dying due to how

expensive said treatment is." (Doc. 30-1 at 8.) Awaal informed Mathis that not providing HCV treatment to him "was CoreCivic policy." Mathis was again told not to bother submitting additional health needs requests regarding HCV because there was "nothing" Awaal would do. (Doc. 30-1 at 8.) Awaal's records of that encounter indicate Mathis had denied any symptoms. (Doc. 27-2 at 68.)

On November 1, 2021, Awaal saw Mathis again. During that visit, Mathis "complained of profuse sweating, right upper abdomen pain, lethargy, difficulty sleeping, fatigue, weakness, headaches, shaking, and dizziness." (Doc. 30-1 at 9.) Awaal informed Mathis his "levels were bad" but still "would not request [HCV] treatment." Because Mathis was "not dying" the cost of the HCV treatment meant CoreCivic would not approve it. (Doc. 30-1 at 9.) Awaal "reaffirmed [Mathis's] symptoms were probably from the Hepatitis C" and Mathis should not bother submitting any health needs requests. (Doc. 30-1 at 9.) According to Awaal, Mathis "denied any symptoms" during this visit. (Doc. 27-3 at 4.)

On November 19, 2021, Mathis was seen by PA Montgomery. (Doc. 27-2 at 88.) Mathis described the same set of symptoms as in previous medical appointments, but PA Montgomery stated CoreCivic policy prohibited him from providing treatment to Mathis. (Doc. 30-1 at 10.) PA Montgomery stated he would request more testing for Mathis because Mathis's levels were "bad." (Doc. 30-1 at 10.) According to PA Montgomery, Mathis "denied symptoms" during this encounter. (Doc. 27-1 at 3.)

On February 20, 2022, Mathis was seen by PA Montgomery. Mathis recited the same symptoms and PA Montgomery stated those symptoms "were probably from the Hepatitis C." (Doc. 30-1 at 11.) PA Montgomery asked how long until Mathis's release date and then ordered additional testing because Mathis's levels were "bad." (Doc. 30-1 at 11.) PA Montgomery stated "he would request [HCV] treatment" for Mathis. (Doc. 30-1 at 11.) PA Montgomery states Mathis "denied Hepatitis C symptoms" during this encounter. (Doc. 27-1 at 3.)

On May 8, 2022, Mathis was seen by PA Montgomery. Mathis reported the same

symptoms and PA Montgomery again asked how long until Mathis's release date. (Doc. 30-1 at 11.) PA Montgomery told Mathis he was a "prime candidate for treatment" and said he would order more tests because Mathis's levels were "bad and staying bad." (Doc. 30-1 at 11.) PA Montgomery does not state whether Mathis reported symptoms at this encounter. (Doc. 27-1 at 4.)

On November 6, 2022, Mathis was again seen by PA Montgomery for a "clinic visit" related to "HCV." (Doc. 27-1 at 24.) Mathis complained of the same symptoms but "with increased frequency and intensity of right upper abdomen pain." (Doc. 30-1 at 12.) PA Montgomery reiterated that Mathis was a "prime candidate" for the treatment. PA Montgomery also stated he would request an ultrasound so Mathis could start the treatment. (Doc. 30-1 at 12.) According to PA Montgomery's notes, Mathis denied "pain, jaundice and icterus." (Doc. 27-1 at 24.) Those notes included the results from a recent "Liver Fibrosis, FibroTest ActiTest Panel." (Doc. 27-1 at 25.) The results indicated Mathis's fibrosis score was 0.32 and stage F1-F2. (Doc. 27-1 at 25.)

PA Montgomery saw Mathis again on January 22, 2023. (Doc. 30-1 at 12.) PA Montgomery stated Mathis's liver was "getting worse" but "not damaged enough to receive the treatment." (Doc. 30-1 at 12.) PA Montgomery stated that the cost of HCV treatment meant Mathis would not be treated until his fibrosis became "irreversible." (Doc. 30-1 at 12.) PA Montgomery requested an ultrasound but Mathis did not receive one. (Doc. 30-1 at 12.)

On March 8, 2023, Mathis was seen by PA Montgomery. At that visit PA Montgomery reiterated that the cost of the HCV treatment was the reason CoreCivic had a policy prohibiting PA Montgomery from even requesting treatment until Mathis's scarring was "irreversible." (Doc. 30-1 at 13.) PA Montgomery stated the policy was necessary because even if prisoners are treated, they often recontract the disease through drug use or tattoos. (Doc. 30-1 at 13.) PA Montgomery allegedly showed Mathis the written policy but refused to provide a copy to Mathis. PA Montgomery stated Mathis "needed the treatment" but "policy" prevented him from receiving it. PA Montgomery's notes from this encounter

recount Mathis was "inquiring about HCV treatment" and PA Montgomery "explained to [Mathis] that per institution policy he does not yet meet the criteria for treatment." (Doc. 27-1 at 22.)

On March 15, 2023, Mathis initiated this action. (Doc. 1.) Approximately six weeks later, PA Montgomery saw Mathis again regarding his HCV. (Doc. 30-1 at 14.) PA Montgomery recorded: Mathis was "inquiring about potential HCV treatment. [Mathis's] Fibrosis score is F1-F2 (0.32). . . . Explained to [Mathis] that he does not meet the criteria for HCV [treatment] at this time but will continue to monitor." (Doc. 27-1 at 19.)

On May 8, 2023, Mathis was again seen by PA Montgomery. (Doc. 27-1 at 16.) During that encounter PA Montgomery explained "CoreCivic was aware of [Mathis's] lawsuit and that there had been a meeting about it." (Doc. 30-1 at 14.) PA Montgomery "reaffirmed that policy would not allow him to treat [Mathis] nor even request treatment until [Mathis] was severely damaged to the point of irreversible." (Doc. 30-1 at 14.) PA Montgomery went on to explain "it would be a struggle to get [Mathis] the treatment" even if he met the criteria. PA Montgomery stated he was trying to get others treated who had met the criteria, but CoreCivic still refused to provide treatment. (Doc. 30-1 at 14.)

## II. Discussion

Mathis is pursuing "an Eighth Amendment medical care claim" against Awaal in her individual capacity and a similar claim against CoreCivic for a custom, policy, or practice of refusing to provide medical care regarding his HCV. (Doc. 6 at 8.) Mathis is also pursuing a state-law negligence claim against the same defendants. Mathis is not pursuing any claim against PA Montgomery.

### A. Eighth Amendment

Not every claim by a prisoner relating to inadequate medical treatment states a violation of the Eighth Amendment. To state a § 1983 medical claim, a plaintiff must show (1) a "serious medical need" by demonstrating that failure to treat the condition could result in further significant injury or the unnecessary and wanton infliction of pain and (2) the defendant's response was deliberately indifferent. *Jett v. Penner*, 439 F.3d 1091, 1096 (9th

Cir. 2006).

"Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). To act with deliberate indifference, a prison official must both know of and disregard an excessive risk to prisoner health; "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Deliberate indifference in the medical context may be shown by a purposeful act or failure to respond to a prisoner's pain or possible medical need and harm caused by the indifference. *Jett*, 439 F.3d at 1096. Deliberate indifference may also be shown when a prison official intentionally denies, delays, or interferes with medical treatment or by the way prison doctors respond to the prisoner's medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976); *Jett*, 439 F.3d at 1096.

Deliberate indifference is a higher standard than negligence or lack of ordinary due care for the prisoner's safety. *Farmer*, 511 U.S. at 835. "Neither negligence nor gross negligence will constitute deliberate indifference." *Clement v. Cal. Dep't of Corr.*, 220 F. Supp. 2d 1098, 1105 (N.D. Cal. 2002); *see also Broughton v. Cutter Labs.*, 622 F.2d 458, 460 (9th Cir. 1980) (mere claims of "indifference," "negligence," or "medical malpractice" do not support a claim under § 1983). "A difference of opinion does not amount to deliberate indifference to [a plaintiff's] serious medical needs." *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). A mere delay in medical care, without more, is insufficient to state a claim against prison officials for deliberate indifference. *See Shapley v. Nev. Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985). The indifference must be substantial, rising to a level of "unnecessary and wanton infliction of pain." *Estelle*, 429 U.S. at 105.

To state a claim under § 1983 against a private entity performing a traditional public function such as providing medical or dental care to prisoners, a plaintiff must allege facts to support that his constitutional rights were violated as a result of a policy, custom, or practice promulgated or endorsed by the private entity. *See Tsao v. Desert Palace, Inc.*,

698 F.3d 1128, 1138-39 (9th Cir. 2012); *Buckner v. Toro*, 116 F.3d 450, 452 (11th Cir. 1997). A plaintiff must allege the specific policy or custom and how it violated his constitutional rights. A private entity is not liable simply because it employed individuals who allegedly violated a plaintiff's constitutional rights. *See Tsao*, 698 F.3d at 1139. To support this type of policy claim, a plaintiff must show: (1) a constitutional injury; (2) the entity had a policy or custom; (3) that policy or custom amounted to deliberate indifference to the plaintiff's constitutional right; and (4) the policy or custom was the moving force behind the constitutional injury. *See Monell*, 436 U.S. at 691–94; *Mabe v. San Bernardino Cnty., Dep t of Pub. Soc. Servs.*, 237 F.3d 1101, 1110–11 (9th Cir. 2001).

Here, there is no dispute that Mathis's HCV constituted a "serious medical need." Accordingly, the primary issues are whether Awaal's response to Mathis's HCV was deliberately indifferent and whether any policy, custom, or practice of CoreCivic caused Mathis's alleged injuries.

### 1. Awaal

Mathis was seen by Awaal on December 8, 2020, June 1, 2021, and November 1, 2021. Crediting non-movant Mathis's evidence, at each of these encounters he complained of profuse sweating, right upper abdomen pain, lethargy, difficulty sleeping, fatigue, weakness, headaches, shaking, and dizziness. Despite those complaints, Awaal refused to provide any treatment. Mathis apparently was focused on obtaining treatment of his HCV through antiviral treatment and Awaal may have believed antiviral treatment was not appropriate. But there is no evidence in the record setting forth such an opinion. Accepting the truth of Mathis's complaints, there is a dispute of fact whether *some* type of treatment was needed based on the pain he says he described.

According to Mathis, he repeatedly complained of serious symptoms, including pain, and Awaal took no action other than informing Mathis his "levels were bad" but he was not entitled to any treatment of his HCV. (Doc. 30-1 at 9.) Such a failure to respond to pain can violate the Eighth Amendment. *See Jett*, 439 F.3d at 1096 (deliberate indifference may be shown by "a purposeful . . . failure to respond to a prisoner's pain"). The court

1 recognizes that, under Awaal's version of the facts, Mathis denied all symptoms during his
2 medical encounters. If accurate, that might explain the lack of treatment. But exactly what
3 happened during the encounters between Awaal and Mathis is a dispute of material fact
4 requiring denial of the motion for summary judgment.

### 2. CoreCivic

CoreCivic's summary judgment motion asserts "[t]here is no evidence that CoreCivic has a policy or practice of training medical personnel to not request expensive treatment or of denying needed medical treatment." (Doc. 26 at 9.) This assertion is incorrect.

Mathis recounts that PA Montgomery and NP Awaal told him multiple times that CoreCivic had a policy to refuse HCV treatment because of its cost. (Doc. 30-1 at 6, 8, 9, 12.) But even setting aside Mathis's declaration, the March 8, 2023, medical record for Mathis's visit with PA Montgomery supports the possible existence of a policy denying HCV treatment for reasons other than medical need. On that date PA Montgomery recorded that Mathis was "inquiring about HCV treatment" and noted PA Montgomery had explained to Mathis "that per institution policy, he does not yet meet the criteria for treatment." (Doc. 27-1 at 22.) An explicit statement by an agent of CoreCivic that "policy" prevented treating Mathis is a pretty good indicator that CoreCivic may have had a "policy" preventing Mathis from receiving treatment. There is therefore a dispute of material fact whether CoreCivic had a policy of denying HCV treatment for reasons other than medical need.

### B. Negligence

Defendants assert that Mathis's negligence claim should be dismissed because he has not presented expert testimony. Because deliberate indifference is a higher standard than negligence, *see Farmer*, 511 U.S. at 835, in the mine-run of cases a failure to show negligence will foreclose a showing of deliberate indifference. But untreated deliberate-indifference pain claims can differ in a way that is important here: "a non-trivial delay in treating serious pain can be actionable even without expert medical testimony showing that

the delay aggravated the underlying condition." *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010).

Arizona courts have long held that a health care provider's breach of the applicable standard of care must be shown by expert medical testimony unless "'the negligence is so grossly apparent that a layman would have no difficulty in recognizing it.'" *Francisco v. Affiliated Urologists Ltd*, 553 P.3d 867, 873 (Ariz. 2024) (quoting *Riedisser v. Nelson*, 534 P.2d 1052, 1054 (Ariz. 1975)). Examples of "grossly apparent" negligence include a cloth sack being left in a patient's abdomen, a six-inch metal clamp left in a patient's abdomen, and "a physician leaving steel sutures in a patient for months." *Francisco*, 553 P.3d at 873 (citing cases). The present situation is not sufficiently similar.

The proper standard of care for the treatment of chronic HCV involves expert medical judgment "to understand the significance of the risks involved and to assess the relative advantages and disadvantages of a given form" of treatment. *Id.* Crediting Mathis's evidence that he complained of serious pain, NP Awaal could have reasonably treated that pain in a variety of ways—whether through antiviral medication to address the underlying HCV Mathis claimed caused the pain, or through some other method. It is not "grossly apparent" that Awaal was required to provide antivirals in this scenario, particularly given the uncontested objective evidence of Mathis's downward-trending liver damage scores. (*See* Doc. 26 at 4.) The absence of expert testimony supporting Mathis is therefore fatal to his negligence claim.

### C. Injunctive Relief

Defendants assert Mathis's request for injunctive relief is moot because "when the new ADCRR protocols are implemented at RRCC, he will receive antiviral treatment for his Hepatitis C based on where he falls on the prioritized list." (Doc. 26 at 13.) As a result of other litigation,[4] "ADCRR has recently been court ordered to change its treatment protocols for Hepatitis C for inmates in the Arizona State Prisons." (Doc. 27-4 at 5.) But "[t]his order does not apply to the private prisons, including RRCC" and "ADCRR and

---

[4] *See Jensen v. Thornell*, CV 12-00601-PHX-ROS (D. Ariz. 2012).

1  CoreCivic are currently negotiating to implement the new ADCRR HCV treatment
2  protocols at CoreCivic's Arizona facilities," presumably to include RRCC. (Doc. 27-4 at
3  5.) There is no evidence the revised protocols have already gone into effect, nor indeed
4  what protocols apply given the court order does not extend to private prisons, nor what
5  eventual "negotiated" form the protocols might take at RRCC. Accordingly, Mathis's
6  request for injunctive relief is not moot. *Garding v. Montana Dep't of Corr.*, 105 F.4th
7  1247, 1255 (9th Cir. 2024) ("If some relief can be granted, the case is not moot.").

### D. Punitive Damages

Defendants assert that Mathis is not entitled to punitive damages. Whether punitive damages are warranted in this case is an issue best left for the jury. *See Pacific Mut. Life Ins. Co. v. Haslip*, 111 U.S. 1, 16 (1991) (noting that, with respect to punitive damages, "[t]his has been always left to the discretion of the jury, as the degree of punishment to be thus inflicted must depend on the peculiar circumstances of each case") (quotation omitted). Accordingly, Defendants' request for summary judgment as to punitive damages will be denied.

**IT IS ORDERED:**

(1) The reference to the Magistrate Judge is **WITHDRAWN** as to Defendants' Motion for Summary Judgment (Doc. 26), and the Motion is **DENIED**.

(2) This action is referred to Magistrate Judge Alison S. Bachus to conduct a settlement conference.

(3) Defense counsel must arrange for the relevant parties to jointly call Magistrate Judge Bachus's chambers at (602) 322-7610 within 14 days to schedule a date for the settlement conference.

Dated this 22nd day of October, 2024.

Honorable Krissa M. Lanham
United States District Judge